# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOOTH FAMILY TRUST, On Behalf of Itself and All Others Similarly Situated, | ) ) | Civil Action No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| BIOVERATIV INC., JOHN G. COX, BRIAN S. POSNER, ALEXANDER J. DENNER, GENO J. GERMANO, LOUIS J. PAGLIA, and ANNA PROTOPAPAS, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) | |

Plaintiff Booth Family Trust ("Plaintiff"), by and through its undersigned counsel, for its complaint against defendants, alleges upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of the public stockholders of Bioverativ Inc. ("Bioverativ" or the "Company") against Bioverativ and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9") and to enjoin the expiration of a tender offer (the "Tender Offer") on a proposed transaction, pursuant to which Bioverativ will be acquired by Sanofi through its indirect wholly-owned subsidiary Blink Acquisition Corp. ("Merger Sub") (the "Proposed Transaction").

2.     On January 22, 2018, Bioverativ and Sanofi issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell Bioverativ to Sanofi.   Under the terms of the Merger Agreement, Sanofi will acquire all outstanding shares of Bioverativ for $105.00 in cash per share of Bioverativ's common stock (the "Offer Price").   Pursuant to the Merger Agreement, Sanofi, through Merger Sub, commenced the Tender Offer on February 7, 2018.   The Tender Offer is scheduled to expire one minute after 11:59 p.m. New York City time on March 7, 2018.   The Proposed Transaction is valued at approximately $11.6 billion.

3.     On February 8, 2018, Bioverativ filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.   The Recommendation Statement, which recommends that Bioverativ stockholders tender their shares in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Bioverativ management's projections, utilized by the Company's financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and Guggenheim Securities, LLC ("Guggenheim"), in their financial analyses (the "Management Projections"); (ii) the sale process that resulted in the Proposed Transaction; (iii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by J.P. Morgan and Guggenheim; and (iv) potential conflicts of interest of Company insiders.   The failure to adequately disclose such material information constitutes a violation of Sections 14(d), 14(e) and 20(a) of the Exchange Act as Bioverativ stockholders need such information in order to make a fully informed decision whether to tender their shares in support of the Proposed Transaction or seek appraisal.

4.     In short, the Proposed Transaction will unlawfully divest Bioverativ's public stockholders of the Company's valuable assets without fully disclosing all material information

concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the expiration of the Tender Offer unless and until such problems are remedied.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Bioverativ is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Bioverativ.

9.      Defendant Bioverativ is a Delaware corporation with its principal executive offices located at 225 Second Avenue, Waltham, Massachusetts 02451.  Bioverativ's common stock is traded on the NASDAQ Global Select Market under the ticker symbol "BIVV."

10.     Defendant John G. Cox ("Cox") has been Chief Executive Officer ("CEO") and a director of the Company since August 2016.

11.     Defendant Brian S. Posner ("Posner") has been Chairman of the Board and a director of the Company since January 2017.

12.     Defendant Alexander J. Denner ("Denner") has been a director of the Company since January 2017.

13.     Defendant Geno J. Germano ("Germano") has been a director of the Company since May 2017.

14.     Defendant Louis J. Paglia ("Paglia") has been a director of the Company since January 2017.

15.     Defendant Anna Protopapas ("Protopapas") has been a director of the Company since February 2017.

16.      Defendants Cox, Posner, Denner, Germano, Paglia, and Protopapas are collectively referred to herein as the "Board" or the "Individual Defendants."

### OTHER RELEVANT ENTITIES

17.     Sanofi is a French société anonyme with its principal executive offices located at 54, rue La Boétie, 75008 Paris, France.  Sanofi is a global biopharmaceutical company focused on providing treatments for rare diseases and long-term chronic conditions.  Sanofi's common stock is traded on the Euronext exchange under the ticker symbol "SAN."

18.     Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of Sanofi.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Bioverativ common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

21.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of February 1, 2018, there were approximately 108,223,091 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Bioverativ or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

22.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

    (a)    Whether defendants have violated Section 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder;

    (b)    Whether the Individual Defendants have violated Section 14(e) of the Exchange Act;

    (c)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(d)    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

23.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

24.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

25.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background

26.    Bioverativ is a global biotechnology company focused on the discovery, research, development and commercialization of innovative therapies for the treatment of hemophilia and other blood disorders.  The Company was formed on August 4, 2016 to hold the hemophilia business of Biogen, Inc. ("Biogen").  Bioverativ separated from Biogen on February 1, 2017 as a result of a special dividend distribution in which Biogen stockholders received one share of Bioverativ common stock for every two shares of Biogen common stock held.  As a result of the distribution, Bioverativ became an independent public company.

27.    The Company markets two products, ELOCTATE and ALPROLIX, which are extended half-life clotting-factor therapies for the treatment of hemophilia A and hemophilia B, respectively.  Bioverativ collaborates with Swedish Orphan Biovitrum AB (publ) ("Sobi") to develop and commercialize ELOCTATE and ALPROLIX globally.  Under the collaboration, the

Company has rights to commercialize ELOCTATE and ALPROLIX in the United States, Japan, Canada, Australia, Latin American countries and all other markets excluding Sobi's commercialization territory, which includes Europe, Russia and certain countries in Northern Africa and the Middle East.

28.     The Company also has an innovative product pipeline with programs in hemophilia, cold agglutinin disease, sickle cell disease, beta thalassemia, and other rare blood disorders. Bioverativ's product pipeline includes: (i) BIVV009, a monoclonal antibody that is currently in Phase 3 clinical development for the treatment of cold agglutinin disease; (ii) BIVV001, an investigational factor VIII therapy designed to potentially extend protection from bleeds with prophylaxis dosing of once weekly or longer for people with hemophilia A; (iii) BIVV002, a Factor IX fusion protein licensed to treat Hemophilia B; (iv) BIVV020, a follow-on monoclonal antibody to treat cold agglutinin disease; and (v) collaborations with Sangamo Therapeutics, Inc. ("Sangamo").

29.     On June 12, and October 2, 2017, respectively, the U.S. Food and Drug Administration ("FDA") accepted the Company's Investigational New Drug ("IND") applications for BIVV001 and ST-400, a gene-edited cell therapy candidate for people with transfusion-dependent beta-thalassemia that the Company is developing in collaboration with Sangamo.

30.     On September 6, 2017, Bioverativ announced that it had entered into a research collaboration with Bicycle Therapeutics Ltd. focused on the discovery, development and commercialization of innovative therapies for hemophilia and sickle cell disease.  According to the press release, "Bicycle Therapeutics will be responsible for leading initial discovery activities through lead optimization to candidate selection for two programs. Bioverativ will lead preclinical and clinical development, as well as subsequent marketing and commercialization."

31.     On October 26, 2017, the Company issued a press release announcing its third quarter of 2017 financial results.  For the quarter, Bioverativ reported revenues of $291.6 million, a 27.2% increase compared to the third quarter of 2016.  ELOCTATE remained on a strong trajectory due to high patient retention, continued capture of patients switching to long-acting therapies, and the market shift to prophylactic treatment.  Defendant Cox commented on the quarter's financial results, stating:

> We are pleased with the progress of the business in the quarter as we continued to deliver on all of our priorities. Our hemophilia franchise grew thanks to strong commercial execution and differentiation of our leading extended half-life products, ELOCTATE® and ALPROLIX. . . . We made significant progress advancing our pipeline with the initiation of the Phase 1/2a trial for BIVV001 and the FDA's acceptance of an IND application for ST-400, a gene-edited cell therapy candidate to treat beta-thalassemia being developed in collaboration with Sangamo Therapeutics. We also entered into a strategic research collaboration with Bicycle Therapeutics to develop innovative therapies to treat rare blood disorders.
>
> As we look toward closing out the year, we are on track to initiate Phase 3 trials for BIVV009 in cold agglutinin disease. We are excited about the potential of bringing forward an important new therapy for these patients who have no approved treatment options today.

32.     On December 11, 2017, the Company announced that its investigational BIVV009 demonstrated safety, tolerability and efficacy in six patients with cold agglutinin disease in a Phase 1b clinical trial.

**The Proposed Transaction**

33.     Following an initial outreach in May 2017, Sanofi again contacted the Company regarding a potential transaction in September 2017.

34.     On November 3, 2017, Sanofi submitted a non-binding proposal.  On November 7, 2017, the Board met to review the proposal and requested that management prepare an overview of the Company's long-range plan as a standalone business.

35.     At a November 21, 2017 Board meeting, members of management presented the Company's long-range plan, "which had been developed to reflect management's views on each of the Company's products and product candidates."  Recommendation Statement at 19.

36.     Following discussions, Sanofi and Bioverativ agreed to the $105.00 Offer Price on January 4, 2018 and entered a period of exclusivity beginning the next day.  Thereafter, the parties continued to negotiate the terms of a transaction.

37.     At a January 19, 2018 Board meeting, management presented updated projections as revised from its previous November 21, 2017 presentation.  At a January 21 Board meeting, J.P. Morgan and Guggenheim each rendered their fairness opinions.  Following the meeting, the parties finalized and executed the Merger Agreement.

38.     On January 22, 2018, Bioverativ and Sanofi issued a joint press release announcing execution of the Merger Agreement.  The press release stated, in relevant part:

> Paris (France) and Waltham, Mass. – January 22, 2018 – Sanofi and Bioverativ Inc., a biopharmaceutical company focused on therapies for hemophilia and other rare blood disorders, have entered into a definitive agreement under which Sanofi will acquire all of the outstanding shares of Bioverativ for $105 per share in cash, representing an equity value of approximately $11.6 billion (on a fully diluted basis).  The transaction was unanimously approved by both the Sanofi and Bioverativ Boards of Directors.

> "With Bioverativ, a leader in the growing hemophilia market, Sanofi enhances its presence in specialty care and leadership in rare diseases, in line with its 2020 Roadmap, and creates a platform for growth in other rare blood disorders.  Together, we have a great opportunity to bring innovative medicines to patients worldwide, building on Bioverativ's success in driving new standards of care with its extended half-life factor replacement therapies," commented Olivier Brandicourt, Sanofi's Chief Executive Officer.  "Combined, we will continue to leverage our scientific know-how, disciplined focus and development expertise that best position us to drive value for our shareholders and create breakthrough treatments for patients."

> Bioverativ Chief Executive Officer, John Cox, noted, "Bioverativ was created to bring meaningful progress to people living with hemophilia and other rare blood disorders, and I am extremely proud of the accomplishments we've made toward

that mission over the past year. We have expanded upon the success of Eloctate and Alprolix, which are making a difference in the lives of people with hemophilia every day, and built a pipeline of novel programs for people with rare blood disorders. Sanofi brings proven capabilities and a global infrastructure, which we believe will help to more rapidly expand access to our medicines globally and further our mission of transforming the lives of people with rare blood disorders. Our Chairman, Brian Posner, our entire Board and I strongly believed our spin-off would create meaningful value for shareholders, and this transaction delivers tremendous value for the shareholders who have invested in and supported our mission."

\* \* \*

**Strengthening Sanofi's Specialty Care Portfolio**
One of the priorities of Sanofi's 2020 roadmap is to "Reshape the Portfolio" and focus on areas where the company currently has, or can effectively build, a leadership position.  The addition of Bioverativ supports this priority by adding to our portfolio a differentiated offering of innovative therapies and providing a platform for growth in rare blood disorders, which will expand our presence in specialty care, further strengthen our leadership position in rare diseases and meet the needs of the patient community.

Beyond its two marketed products, Bioverativ's pipeline includes a program in Phase 3 testing for cold agglutinin disease, and early stage research programs and collaborations in hemophilia, and other rare blood disorders, including sickle cell disease and beta thalassemia. Sanofi's R&D organization will support Bioverativ in bringing these important therapies to patients faster.  Furthermore, Sanofi's global presence, proven expertise and success in launching specialty medicines, and established footprint in key emerging markets will help Bioverativ fully capitalize on growth opportunities for Bioverativ's current and future products.

**Delivering Shareholder Value**
The addition of Bioverativ is expected to drive meaningful value for Sanofi's shareholders, with strong cash flows from Bioverativ's growing products expected to increase Sanofi's financial and operational scale. The acquisition is expected to be immediately accretive to Sanofi's Business EPS in FY2018 and up to 5% accretive in FY2019. Sanofi is also projected to achieve ROIC in excess of cost of capital within three years. Sanofi expects to preserve its strong credit rating.

**Transaction Terms**
Under the terms of the merger agreement, Sanofi will commence a tender offer to acquire all of the outstanding shares of Bioverativ common stock at a price of $105 per share in cash.  The $105 per share acquisition price represents a 64 percent premium to Bioverativ's closing price on January 19, 2018.

The consummation of the tender offer is subject to various conditions, including

the tender of at least a majority of the outstanding Bioverativ shares, redelivery of a tax opinion delivered at signing, the expiration or termination of the waiting period under the Hart Scott Rodino Antitrust Improvements Act and receipt of certain other regulatory approvals, and other customary conditions. Following the successful completion of the tender offer, a wholly owned subsidiary of Sanofi will merge with Bioverativ and the outstanding Bioverativ shares not tendered in the tender offer will be converted into the right to receive the same $105 per share in cash paid in the tender offer. The tender offer is expected to commence in February 2018.

Sanofi plans to finance the transaction with a combination of cash on hand and through new debt to be raised. The tender offer is not subject to any financing condition. Subject to the satisfaction or waiver of customary closing conditions, the transaction is expected to close within three months.

**Insiders' Interests in the Proposed Transaction**

39.     Sanofi and Bioverativ insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Bioverativ.

40.     The Company's directors and executive officers will receive substantial cash consideration in connection with tendering their shares of Company common stock in the Tender Offer, as set forth in the following table:

| Name of Executive Officer or Director | Number of Shares (#) | Cash Consideration for Shares ($) |
|---|---|---|
| Brian S. Posner | 6,693 | 702,765 |
| Alexander J. Denner, Ph.D.(1) | 1,170,001 | 122,850,105 |
| Louis J. Paglia | 5,056 | 530,880 |
| Anna Protopapas | 1,056 | 110,880 |
| Geno Germano | — | — |
| John G. Cox | 68,386 | 7,180,530 |
| John T. Greene | 500 | 52,500 |
| Rogério Vivaldi Coelho, M.D. | 315 | 33,075 |
| Andrea DiFabio | 13,584 | 1,426,320 |
| Lucia Celona | 8,280 | 869,400 |
| Richard Brudnick | 10,533 | 1,105,965 |
| Timothy Harris, Jr. | 384 | 40,320 |
| **All of our current directors and executive officers as a group** | 1,284,788 | 134,902,740 |

(1)  1,165,000 of the Shares reported are beneficially owned by Sarissa Capital Master Offshore Fund LP, a Cayman Island exempted limited partnership (" *Sarissa Offshore* "). Sarissa Capital

Management GP LLC, a Delaware limited liability company (" *Sarissa Capital GP* "), is the general partner of Sarissa Capital Management LP, a Delaware limited partnership (" *Sarissa Capital* "), the investment advisor to Sarissa Offshore. Dr. Denner is the Chief Investment Officer of Sarissa Capital and the managing member of Sarissa Capital GP. By virtue of the foregoing, Dr. Denner may be deemed to indirectly beneficially own (as that term is defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the " *Exchange Act* ")) the Shares that Sarissa Offshore directly beneficially owns. Dr. Denner disclaims beneficial ownership of these Shares except to the extent of any pecuniary interest therein.

41.    Additionally, Company insiders stand to reap a substantial financial windfall for securing the deal with Sanofi.  Each outstanding Company option and restricted stock unit will fully vest and convert into the right to receive cash payments.  The following tables summarize the cash payments the Company's executive officers and directors stand to receive in connection with their equity awards upon consummation of the Proposed Transaction:

| Name of Executive Officer or Director | Number of Shares Subject to Vested Options (#) | Weighted-Average Exercise Price Per Share ($) | Cash Consideration for Vested Options ($) | Number of Shares Subject to Unvested Options (#) | Weighted Average Exercise Price Per Share ($) | Cash Consideration for Unvested Options ($) | Total Cash Consideration for Options in Merger ($) |
|---|---|---|---|---|---|---|---|
| Brian S. Posner | — | — | — | 29,798 | 44.51 | 1,802,481 | 1,802,481 |
| Alexander J. Denner | — | — | — | 26,818 | 44.51 | 1,622,221 | 1,622,221 |
| Louis J. Paglia | — | — | — | 26,818 | 44.51 | 1,622,221 | 1,622,221 |
| Anna Protopapas | — | — | — | 23,006 | 52.08 | 1,217,478 | 1,217,478 |
| Geno Germano | — | — | — | 21,729 | 55.04 | 1,085,581 | 1,085,581 |
| John G. Cox | 66,611 | 8.29 | 6,441,950 | 581,049 | 44.51 | 35,147,654 | 41,589,604 |
| John T. Greene | — | — | — | 169,845 | 44.51 | 10,273,924 | 10,273,924 |
| Rogério Vivaldi Coelho, M.D. | — | — | — | 169,845 | 44.51 | 10,273,924 | 10,273,924 |
| Andrea DiFabio | — | — | — | 119,189 | 44.51 | 7,209,743 | 7,209,743 |
| Lucia Celona | — | — | — | 104,291 | 44.51 | 6,308,563 | 6,308,563 |
| Richard Brudnick | — | — | — | 104,291 | 44.51 | 6,308,563 | 6,308,563 |
| Timothy Harris, Jr. | — | — | — | 68,315 | 56.34 | 3,324,208 | 3,324,208 |

| Name of Executive Officer or Director | Number of RSUs (#) | Cash Consideration for RSUs ($) |
|---|---|---|
| Brian S. Posner | 6,364 | 668,220 |
| Alexander J. Denner | 5,455 | 572,775 |
| Louis J. Paglia | 5,455 | 572,775 |
| Anna Protopapas | 5,455 | 572,775 |
| Geno Germano | 5,455 | 572,775 |
| John G. Cox | 321,628 | 33,770,940 |

| | | |
|---|---|---|
| John T. Greene | 64,071 | 6,727,455 |
| Rogério Vivaldi Coelho, M.D. | 64,071 | 6,727,455 |
| Andrea DiFabio | 60,198 | 6,320,790 |
| Lucia Celona | 53,808 | 5,649,840 |
| Richard Brudnick | 55,206 | 5,796,630 |
| Timothy Harris, Jr. | 52,180 | 5,478,900 |

42.     Moreover, if they are terminated in connection with the Proposed Transaction, Bioverativ's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation, as set forth in the following table:

| Name(1) | Cash ($)(2) | Equity ($)(3) | Perquisites/ Benefits ($)(4) | Tax Reimbursement ($) | Total ($) |
|---|---|---|---|---|---|
| *Named Executive Officers* | | | | | |
| John G. Cox | 3,267,945 | 68,918,594 | 142,108 | (5) | 72,328,647 |
| John T. Greene | 1,432,791 | 17,001,379 | 106,081 | (5) | 18,540,251 |
| Rogério Vivaldi Coelho, M.D. | 1,146,233 | 17,001,379 | 115,592 | (5) | 18,263,204 |

## The Recommendation Statement Contains Numerous Material Misstatements or Omissions

43.     The defendants filed the materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to Bioverativ's stockholders.  The Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares or seek appraisal in connection with the Proposed Transaction.

44.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Bioverativ's Management Projections; (ii) the sale process that resulted in the Proposed Transaction; (iii) the valuation analyses performed by J.P. Morgan and Guggenheim in support of their fairness opinions; and (iv) potential conflicts of interest of Company insiders.  Accordingly, Bioverativ's stockholders are being asked to tender their shares in favor of the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Bioverativ Management's Financial Projections***

45.     The Recommendation Statement is materially deficient because it fails to disclose material information relating to Bioverativ's intrinsic value and prospects going forward.

46.     The Recommendation Statement fails to disclose: (i) the estimated unlevered free cash flows to be generated by each of the Company's products and product candidates over the projection period of 2018 through 2035; (ii) Company management's assumptions regarding the probability of success of the products currently under development by the Company used to derive the Management Projections; and (iii) quantification of the probabilities, assigned by Company management, of achieving regulatory success and/or commercial success with its products and the sources of the quantification of the probabilities assigned by Company management.

47.     The omission of this information renders the statements in the "Certain Unaudited Prospective Financial Information" section of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Sale Process***

48.     The Recommendation Statement also fails to disclose or misstates material information relating to the sale process leading up to the Proposed Transaction.

49.     The Recommendation Statement sets forth "[o]n November 21, 2017, a meeting of our Board of Directors was convened to discuss the Company's preliminary long-range plan as a standalone business. . . . At the meeting, certain members of senior management presented the Company's long-range plan as a standalone business, which had been developed to reflect management's views on each of the Company's products and product candidates." Recommendation Statement at 19.  The Recommendation Statement also sets forth that "[o]n January 19, 2018, our Board of Directors held an in-person meeting with members of senior

management. . . . Management [] presented updated projections as revised from its previous presentation on November 21, 2017." *Id.* at 25.

50.     The Recommendation Statement fails, however, to disclose the differences between the Company's long-range plan as a standalone business presented by senior management of the Company at the November 21, 2017 Board meeting and the updated projections as revised and presented at the January 19, 2018 Board meeting, the basis for management's revision to the projections and whether the updated projections were revised downward form the earlier set of projections.

51.     The omission of this information renders the statements in the "Background of the Offer and Merger" section of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning J.P. Morgan's and Guggenheim's Financial Analyses***

52.     The Recommendation Statement also describes J.P. Morgan's and Guggenheim's fairness opinions and the various valuation analyses they performed in support of their opinions. However, the description of J.P. Morgan's and Guggenheim's fairness opinions and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Bioverativ's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's and Guggenheim's fairness opinions in determining whether to tender their shares in favor of the Proposed Transaction or seek appraisal.  This omitted information, if disclosed, would significantly alter the total mix of information available to Bioverativ's stockholders.

53.     For example, with respect to J.P. Morgan's *Sum-of-the-Parts Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose (i) the inputs and assumptions

underlying the discount rate range of 8.25% to 10.25%; and (ii) quantification of the unlevered free cash flows for certain revenue producing parts of the Company that the terminal asset value growth rate was applied to in order to derive the range of terminal asset values for the Company.

54.     With respect to J.P. Morgan's *WholeCo Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the inputs and assumptions underlying the discount rate range of 8.25% to 10.25%.

55.     With respect to Guggenheim's *Discounted Cash Flow Analyses*, the Recommendation Statement fails to disclose: (i) the projected, risk-adjusted, after-tax unlevered free cash flows (after deduction of stock-based compensation) for each of the Company's existing and pipeline products used in the *Sum-of-the-Parts Discounted Cash Flow Analysis*; (ii) the inputs and assumptions underlying the discount rate range of 8.5% to 10.5%; and (iii) the illustrative/continuing values implied by the perpetual growth rate references for both the *Sum-of-the-Parts Discounted Cash Flow Analysis* and the *Going-Concern Discounted Cash Flow Analysis.*

56.     With respect to Guggenheim's *Selected Precedent Merger and Acquisition (M&A) Transactions* analysis, the Selected Precedent M&A Transaction Multiples chart ("Transaction Multiples Chart") set forth on page 50 of the Recommendation Statement is false and misleading. The Transaction Multiples Chart sets forth that the "High" Transaction Enterprise Value/NTM Adjusted EBITDA and Transaction Stock Price/NTM EPS multiples for the selected precedent merger and acquisition transactions analyzed by Guggenheim are 20.7x and 26.6x, respectively. This is false.  J.P. Morgan analyzed the same nine transactions for its *Selected Transaction Analysis*.  For its analysis, J.P. Morgan excluded the EV/NTM Adjusted EBITDA and Price/NTM EPS multiples for two transactions, Johnson & Johnson's acquisition of Actelion Ltd. and Valeant

International Inc.'s acquisition of Salix Pharmaceuticals, Inc., as not meaningful, stating "EV/Adjusted EBITDA multiples above 25.0x and price/EPS multiples above 35.0x listed as "NM"." Recommendation Statement at 40. Because Guggenheim utilized the same set of transactions in its analysis and the multiples for each of Johnson & Johnson's acquisition of Actelion Ltd. and Valeant International Inc.'s acquisition of Salix Pharmaceuticals, Inc. were greater than 25.0x and 35.0x for EV/Adjusted EBITDA 2018E and Price/EPS 2018E, respectively, the high multiples in Guggenheim's analysis cannot be 20.7x and 26.6x. Guggenheim's Transaction Multiples Chart needs to be corrected to accurately set forth the high multiples for the transactions observed in its analysis.

57.     Similarly, with respect to Guggenheim's *Selected Publicly Traded Companies Analysis*, the Selected Publicly Traded Company Multiples chart ("Company Multiples Chart") set forth on page 51 of the Recommendation Statement is false and misleading. The Company Multiples Chart sets forth that the "High" Enterprise Value/2018E Adjusted EBITDA and Stock Price at 01/19/18/2018E EPS multiples for the selected publicly traded companies analyzed by Guggenheim are 14.3x and 17.4x, respectively. This is false. J.P. Morgan analyzed the same nine publicly traded companies for its *Public Trading Multiples* analysis. For its analysis, J.P. Morgan excluded the EV/Adjusted EBITDA 2018E and Price/EPS 2018E multiples for three companies, Vertex Pharmaceuticals Inc., Incyte Corporation and BioMarin Pharmaceutical Inc., as not meaningful, stating "EV/Adjusted EBITDA multiples above 25.0x and price/EPS multiples above 35.0x listed as not meaningful ("NM")." Recommendation Statement at 39. Because Guggenheim utilized the same set of companies in its analysis and the multiples for each of Vertex Pharmaceuticals Inc., Incyte Corporation and BioMarin Pharmaceutical Inc., were greater than 25.0x and 35.0x for EV/Adjusted EBITDA 2018E and Price/EPS 2018E, respectively, the high

multiples in Guggenheim's analysis cannot be 14.3x and 17.4x.  Guggenheim's Company Multiples Chart needs to be corrected to accurately set forth the high multiples for the companies observed in its analysis.

58.     The omission of this information renders the statements in the "Opinions of Financial Advisors" section of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Company Insiders' Potential Conflicts of Interest***

59.     Further, the Recommendation Statement fails to disclose material information concerning the potential conflicts of interest faced by Bioverativ insiders.

60.     The Recommendation Statement discloses that "it is possible that additional members of our current management team will enter into new employment or consulting arrangements with the Surviving Corporation. Such arrangements may include the right to purchase or participate in the equity of Purchaser or its affiliates. Any such arrangements with our existing management team are currently expected to be entered into after the completion of the Offer and will not become effective until after the Merger is completed, if at all.  There can be no assurance that the applicable parties will reach an agreement on any terms, or at all." Recommendation Statement at 13.  Yet, the Recommendation Statement fails to disclose whether any of Sanofi's prior proposals or indications of interest mentioned new employment or consulting arrangements with Sanofi and the right to purchase or participate in the equity of Sanofi.

61.     Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of

management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

62.     The omission of this information renders the statements in the "Past Contracts, Transactions, Negotiations and Agreements," and "Background of the Offer and Merger" sections of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act.

63.     The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement.  Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction or seek appraisal and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations
of Section 14(d) of the Exchange Act and SEC Rule 14d-9**

64.     Plaintiff repeats all previous allegations as if set forth in full.

65.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting Bioverativ stockholders to tender their shares in the Tender Offer.

66.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

67.    The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omission renders the Recommendation Statement false and/or misleading.

68.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

69.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision whether to tender their shares if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**Class Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act**

70.    Plaintiff repeats all previous allegations as if set forth in full.

71.    Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in light of the circumstances

under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the Tender Offer.

72.     Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender its shares pursuant to the Tender Offer or seek appraisal.

73.     As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender its shares or seek appraisal.

## COUNT III

### Class Claims Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

74.     Plaintiff repeats all previous allegations as if set forth in full.

75.     The Individual Defendants acted as controlling persons of Bioverativ within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Bioverativ and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

76.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

78.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

79.     By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in its favor on behalf of Bioverativ, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: February 15, 2017

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins (BBO#657485)
LEVI & KORSINSKY LLP
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com

**OF COUNSEL:**

*Attorneys for Plaintiff*

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010